**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KIM M. KWITSCHAU** | ) | |
| | ) | |
| **Plaintiff-Claimant,** | ) | |
| | ) | **No. 11 C 6900** |
| **v.** | ) | |
| | ) | **Jeffrey T. Gilbert** |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant-Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Kim M. Kwitschau ("Claimant") brings this action under 42 U.S.C. § 405(g),

seeking reversal or remand of the decision by Respondent Carolyn W. Colvin[1], Acting

Commissioner of Social Security ("Commissioner"), denying Claimant's application for

disability insurance benefits. This matter is before the Court on Claimant's motion for summary

judgment [Dkt. # 20].

Claimant argues that the Commissioner's decision denying her application for disability

insurance benefits should be reversed or, alternatively, should be remanded for further

proceedings because it contains errors of law and is not supported by substantial evidence. In

support of her motion for summary judgment, Claimant argues that the Administrative Law

Judge: (1) erred in failing to account for Claimant's pain and other impairments, in combination,

in the residual functioning capacity ("RFC") and erroneously found that she was capable of light

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure ("Rule") 25, Carolyn W. Colvin is automatically substituted as the Defendant in this suit. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

work; and (2) failed to make required credibility findings. For the reasons set forth more fully below, Claimant's motion for summary judgment [Dkt. # 20] is granted in part. This matter is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

### A. Procedural History

Claimant is a forty-five year-old woman who suffers from migraines, fibromyalgia, severe disc degeneration and the pain associated with these physical impairments. R. 154. Claimant filed an application for Social Security disability insurance benefits on January 30, 2007, alleging a disability onset date nine and a half year earlier, on July 30, 1997, due to severe disc degeneration, migraine headaches, and fibromyalgia. R. 146, 258, 276. Claimant's date last insured was December 31, 2002.[2]

The Social Security Administration ("SSA") denied her initial application on April 6, 2007. R. 146. Claimant filed a request for reconsideration on June 25, 2007. That request for reconsideration was denied on July 12, 2007. R. 178, 180.

Claimant then filed a timely written request for a hearing before an Administrative Law Judge ("ALJ") on September 11, 2007. R. 183. The ALJ held a hearing on April 6, 2009. R. 124. Dr. James McKenna attended as a medical expert and William Schweihs ("Schweihs") testified as a vocational expert. *Id*. The ALJ continued the hearing to allow the parties to submit

---

[2] Because Social Security disability benefits under Title II equal insurance against lost income caused by disability, the applicant/worker must show a recent connection to the work force to maintain insured status. 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130. This generally means the applicant was working in 20 of the last 40 quarters. For an applicant who is thirty-one years old or older, the "last date of insured status" is generally five years after her date of last work.

additional evidence. At the reconvened hearing on February 1, 2010, Dr. Carl G. Leigh ("Dr. Leigh") and Dr. Mark I. Oberlander ("Dr. Oberlander") testified as medical experts and Edward Pagella ("Pagella") testified as a vocational expert. R. 21.

On April 26, 2010, the ALJ issued a decision denying the claim for benefits. R. 148-169. Claimant filed a timely request for review of the ALJ's decision on June 24, 2010. R. 12. The Appeals Council denied review on March 15, 2011 and again on June 15, 2011, making the ALJ's decision the final decision of the Commissioner. R. 8, 17. Claimant subsequently filed this appeal pursuant to 42 U.S.C. § 405(g).

**B. Hearing Testimony - April 6, 2009**

The April 6, 2009 hearing lasted less than thirty minutes. R. 126, 142. At the outset of the hearing, the ALJ noted a number of problems that required him to continue the hearing to a later date. R. 127-129. Due to computer problems, the medical expert had not received all of Claimant's medical records and was not prepared to provide an opinion as to the severity of Claimant's impairments. R. 128. The ALJ also noted that Claimant had not undergone a psychological clinical evaluation. R. 127. Because of the possibility of an emotional component to Claimant's impairments, the ALJ thought a psychological evaluation could be helpful. *Id.*

At the April 6, 2009 hearing, the ALJ and vocational expert, Schweihs, asked Claimant questions about her past work experience, and Schweihs opined as to the type of past work Claimant had performed. R. 131-142. Claimant testified about her past work experience as an office assistant for a baking company from 1986 to 1994. R. 132. In that job, Claimant performed office work, packaged and shipped items, loaded and unloaded boxes, and engaged in some sales and marketing tasks. R. 131-133. Based on Claimant's description of her duties,

Schweihs opined that she was a semi-skilled administrative assistant with a medium level of physical exertion, with an SVP of 4. R. 134. In the national economy, that work is generally performed at a SVP between 5 and 7, and is mostly clerical and sedentary. *Id.*

After the baking company job, Claimant worked as an administrative assistant in a hotel business center, performing tasks similar to the ones she performed for the baking company until 1997. R. 135. Claimant was promoted to assistant manager and then regional manager. R. 136. As an assistant manager, Claimant performed many shipping tasks. *Id.* The regional manager position involved significant travel. *Id.* As a regional manager, Claimant was involved in marketing, staff training, and interviewing. R. 137. Schweihs opined that the regional manager position was skilled with a SVP of 5 and a medium level of physical exertion. R. 139. He further opined that the job was in a specialized industry and was not generally performed in the national economy. *Id.* Schweihs opined that prior to becoming a regional manager, Claimant was performing administrative assistant tasks for the hotel business center. R. 141. That position in the national economy is generally sedentary with a SVP between 5 and 7. *Id.* As Claimant was performing the position, it was a 4 or 5 with a medium level of physical exertion. *Id.*

## C. Hearing Testimony - February 1, 2010

Five individuals testified at the reconvened hearing, which was more extensive than the initial hearing in April 2009.

### 1. Kim M. Kwitschau, Claimant

Claimant began seeing Dr. Milet, a chiropractor, to address her migraine headaches and neck and back pain in September 1999, a few months after her daughter was born. R. 56-57. After the birth of her daughter, Claimant went through in-vitro fertilization procedures three

times before she gave birth to her son in December 2001.  R. 45-46, 58. Claimant nursed each child for a year. R. 58.

Claimant did not clean her house in 1999. R. 59. Because of back problems, she had a cleaning service and her mom helped with straightening up. R. 60. In order to nurse her daughter, Claimant used a special nursing pillow and a stool. *Id.* Claimant's mom or husband bathed her daughter. R. 61. Sometimes, Claimant would bathe her daughter in a customized higher sink, but never bent over a tub. R. 61-62. Claimant's mom also helped change diapers, or Claimant would change diapers on a waist-high counter. R. 63. Either Claimant's mom shopped for groceries, or she had them delivered by Peapod. R. 65.

Claimant did not go to Dr. Milet often in 2001 because she was pregnant. R. 65. Claimant also testified that Dr. Milet moved her offices farther away in 2002. R. 66. With two young children and farther to travel, the frequency of her visits to Dr. Milet decreased. *Id.* Between 1999 and 2002, Claimant could only be in a car for 30-45 minutes. R. 70. When Claimant's children were young, she took naps when they did. R. 71.  Claimant testified that she had neck pain when her kids were young, but that the pain has gotten progressively worse. R. 83. That pain was very severe in 2001 and 2002, after her son was born. *Id.*

Claimant testified that she is on preventative medication for migraines twice a day. R. 76. Claimant experienced her first migraine at age 16. R. 77. When her kids were babies, between 1999 and 2001, she testified that she suffered migraine headaches two or three times per week. R. 78. She currently experiences two to three migraines per week even while taking Topamax. *Id.* Her migraines have gotten worse over time, but she always had at least one per week. *Id.* When Claimant experiences a migraine, she takes medication, lays down in a dark room, and

uses cold compresses. R. 79.

## 2. Dr. Leigh, Medical Expert

Dr. Leigh testified Claimant suffered from migraine headaches and degenerative disc disease of the cervical spine as of her date last insured. R. 28. He referenced a January 2001 MRI that showed bulging discs, but without herniation and without central stenosis. *Id*. Dr. Leigh found that the earliest possible onset date for the neck and back pain was July 2000 and that the pain was persistent intermittently thereafter. R. 30. He also found that the degenerative disc disease was progressive. *Id*. As for the migraine headaches, Dr. Leigh initially opined that the medical evidence did not contain an adequate description of the nature, duration, functional impact or frequency of the headaches, and that they did not meet a relevant Listing of Impairment. R. 29. He further testified that the medical evidence did not document a course of preventative treatment for the migraines. *Id*.

Dr. Leigh opined that either singularly or in combination, the migraines and degenerative disc disease resulted in an impairment or combination of impairments before Claimant's date last insured that had more than a minimal effect upon her ability to perform the universe of work-related activities. *Id*. However, he did not believe that Claimant's impairments, either singularly or in combination, met or equaled the criteria of any of the Listings of Impairments. R. 30-31.

There is no specific impairment listing for migraines. R. 155. However, they can be analogized to the provisions for *petit mal*, or non-convulsive, seizures in § 11.03 of the Listing of Impairments. In order to meet that Listing, Claimant must suffer from more than one medically severe migraine headache per week despite at least three months of prescribed treatment. R. 40. Dr. Leigh testified that there was no doubt that Claimant suffers from true or classical migraine

headaches. R. 39.  While Dr. Leigh felt there was enough evidence to show Claimant suffered

from migraine headaches, he did not think there was enough for him to equate Claimant's

migraines with Listing § 11.03.  R. 31.

Dr. Leigh concluded that Claimant's RFC as of her date last insured at the end of 2002,

would have been limited to lifting and carrying ten pounds, both occasionally and frequently,

standing/walking a maximum of four hours out of an eight hour work day, with no limitation on

sitting. R. 31. Claimant also would have needed to avoid all hazardous, unprotected heights, and

climbing ramps and stairs would have been on an occasional basis. *Id*. As for environmental

limitations, Claimant would have needed to avoid even moderate exposure to vibration and

concentrated exposure to hazardous machinery, and no commercial driving. *Id*.

After he heard Claimant's testimony during the February 1, 2010 hearing and was

reminded that Claimant was taking Zomig during the relevant time period ("I would stand

corrected." (R. 32-35)),  Dr. Leigh revised his opinion: "[B]ased on the testimony, your honor, in

addition to the medical evidence of record, I would revise my testimony to say that, in my

opinion, [Claimant] could not sustain substantial gainful activity eight hours a day, five days a

week." R. 96.

Dr. Leigh testified that it was "not unlikely" that because Claimant was pregnant in

January 2001 and would have been limited to taking one Zomig pill per day because of that

pregnancy, the number of Zomig pills she was prescribed meant that she was having at least six

medically severe headaches per month. R. 46.  Claimant's insurance company limited her to six

Zomig pills per month, which her treating physician, Dr. Ta, did not think was sufficient. R. 36-

37.  Dr. Ta dictated a letter to Claimant's insurance company asking that it allow Claimant more

than six Zomig pills per month. R. 729. Dr. Leigh stated that Zomig is usually for acute treatment of a specific headache, rather than to prevent the occurrence of headaches (R. 35, 44) but that it can be used for maintenance therapy at a low dose (R. 35).

### 3. Dr. Oberlander, Psychological Expert

Dr. Oberlander testified that there was no evidence in the record that Claimant had sought or was in need of psychological treatment between July 30, 1997 and February 1, 2010. R. 49. In May 2009, Claimant was found, based on mental issues, not to have any functional impairments and her mental status exams and memory functioning were within normal limits. R. 50. Based solely on psychiatric grounds, Dr. Oberlander found that between July 30, 1997 and December 31, 2002, Claimant could understand and carry out both simple and complex work instructions and activities. R. 52. She also would have retained the motivational capacity to act with a fair amount of persistence and pace in work settings and would not have needed allowances for social or interactive issues. *Id*. She also would have been able to adapt to changes in work settings and formulate goals for herself. R. 52-53. Dr. Oberlander did not need to revise this opinion based on Claimant's testimony during the February 1, 2010 hearing. R. 96.

### 4. Edward Pagella, Vocational Expert

Pagella agreed with the occupational assessments of Schweihs during the April 6, 2009 hearing. R. 86. Based on the RFCs described by Dr. Leigh and Dr. Oberlander, Pagella opined that as of her date last insured, Claimant would have been capable of performing past relevant work as an administrative assistant as it is normally performed in the national economy, but not as Claimant was performing the role. R. 87. However, if Claimant was experiencing migraines one to three times per week as she described during the relevant time period, she would not have

8

been able to perform the work Pagella described. R. 87-88. Further, given the limitations Claimant described regarding not being able to bend, or lift/carry more than five pounds, no individual with Claimant's vocational profile would be capable of performing competitive employment in the national economy because that person would be off task too much and could not maintain industrial pace. R. 88-89.

**5. Reanna Mirenda, witness**

Reanna Mirenda ("Mirenda") is Claimant's niece. R. 110. She lived with Claimant for a year or two when she was nine or ten years old, sometime around 2000 or 2001. R. 111-112. Mirenda went with Claimant to chiropractic appointments. R. 113. Miranda confirmed that Claimant's groceries were delivered by Peapod and that a cleaning service cleaned Claimant's house. R. 115, 118. She also stated that Claimant had headaches all the time during that period. R. 115. According to Mirenda, Claimant suffered from headaches a couple of times a week and would go upstairs and lay down in a dark room. R. 116. Claimant would stay in her room for a couple of hours and sometimes would be there all night. *Id*. Claimant also complained to Mirenda about her neck and back pain during that time. R. 117.

**D. Medical Evidence**

On January 15, 1998, Claimant was hospitalized for a headache that lasted four days, and was described as bitemporal, throbbing, constant, worse with bending and associated with photophobia, nausea and vomiting. R. 562. The treating physician noted a family history of migraines and that Claimant used her mother's prescriptions for Midrin and Fiorcet to treat her migraines. *Id*. Claimant was treated with Demerol and Vistaril and was prescribed Fiorinal. *Id*.

On February 2, 1998, Claimant visited Dr. Ta, a neurologist, for the first time. R. 722. Dr.

Ta performed a neurological examination and noted Claimant was complaining of headaches, and low back and neck pain. *Id*. He noted a long standing history of headaches dating back to 1989. *Id*. Claimant was taking Motrin and Tylenol and some medication from her mother for her headaches. *Id*. Dr. Ta took x-rays of Claimant's cervical and lumbar spine, which showed some minimal degenerative disc disease at the L5, SI area. R. 723. Dr. Ta found that Claimant likely had a problem with chronic, recurrent migraine headaches, and that her back pain was most likely due to degenerative disc disease. *Id*. He prescribed 25 mg of Pamelor once a day, 400 mg of Naprosyn twice a day, and Fiorinal to be used as needed. *Id*.

At an April 6, 1998 follow-up evaluation, Dr. Ta noted that Claimant was doing better and that most of her headaches had resolved. R. 724. He further noted that she was taking 50 mg of Nortriptyline every night, without side effects. *Id*. She was also taking 500 mg of Naprosym twice a day and Fiorinal as needed. *Id*. Dr. Ta further noted that Claimant was planning to start a family and that he advised her that she probably needed to discontinue use of all medications in the early stages of a pregnancy. *Id*.

Claimant returned to Dr. Ta on July 6, 1998 and reported quite severe, intermittent, recurrent headaches. R. 725. Dr. Ta's impressions were that Claimant was suffering from chronic, recurrent migraines and low back and left leg pain, suspicious of lumbar radiculopathy. *Id*. Because Claimant was trying to conceive, Dr. Ta wanted to defer additional evaluations of her low back and prescribed 10 mg of Inderal twice a day. *Id*.

Claimant saw Dr. Milet on September 14, 1999. R. 368. Dr. Milet noted that Claimant reported suffering from migraines one to two times per week and that they lasted up to three days and that she was taking Fiorcet to treat them. R. 370. Claimant saw Dr. Milet at least thirteen

times in 1999 and fifteen times in 2000. R. 376-380. She also saw him four times in the end of 2002. R. 380-381.

Dr. Ta's next evaluation note is dated July 19, 2000, almost two years after the July 1998 visit described above. R. 726. Dr. Ta did not prescribe a specific migraine treatment because Claimant was undergoing fertility treatments and planning another pregnancy shortly. *Id*. Claimant reported, over the last month or two, a change in the nature of her headaches and an increase in frequency and intensity. *Id*. Dr. Ta diagnosed continued migraine headaches, but in light of the reported change in the nature of the headaches, recommended a MRI to rule-out serious intracranial problems. *Id*.

Claimant returned to Dr. Ta for a follow-up on July 24, 2000. R. 727. Dr. Ta noted that Claimant's MRI did not show any evidence of tumor or any other structural lesion that would account for her headaches. *Id*. Claimant also complained of neck and low back pain, but Dr. Ta did not order an MRI of the back because Claimant was pregnant. *Id*. Dr. Ta's impression was that Claimant was suffering from chronic recurrent migraines, allergic rhinitis and chronic neck and low back pain secondary to musculoskeletal pain. *Id*. Dr. Ta prescribed Fiorinal and told Claimant to use Fiorinal with codeine when the headaches were severe. *Id*. Dr. Ta delayed a definitive migraine treatment until Claimant completed her pregnancy. *Id*.

Claimant returned to Dr. Ta on November 13, 2000. R. 728. At that time Claimant was undergoing fertility treatments and was taking Fiorinal. *Id*. Claimant reported severe neck pain that she thought might be triggering headaches. *Id*. Because Claimant was trying to get pregnant, Dr. Ta did not prescribe additional medication and ordered an MRI of Claimant's cervical spine and an EMG examination. *Id*.

On January 3, 2001, Dr. Ta noted that the MRI of the cervical spine showed a bulging disc paracentrally at C5-6, but no significant disc herniation or any spinal stenosis. R. 729. Claimant was still suffering from severe neck and shoulder pain, and the neck pain was triggering headaches. *Id*. Claimant was taking 50 mg of Vioxx at night and 5 mg of Zomig for headaches as needed, which was working well. *Id*. Dr. Ta further noted that Claimant's insurance only allowed six tablets of Zomig per month, which he considered unfortunate. *Id*. Dr. Ta's impression was that Claimant had chronic neck and shoulder pain from degenerative disc disease of the cervical spine and chronic, recurrent migraine headaches that responded to Zomig. *Id*. Dr. Ta dictated a letter to Claimant's insurance company asking that she be allowed to obtain more than six Zomig pills per month, and prescribed Midrin as an adjunctive treatment if the headaches were not too severe. *Id*.

On October 1, 2002, Claimant went to the emergency room for a severe headache. R. 650. She was assessed as having acute cephalgia and a history of migraine headaches. *Id*. She was given an injection of 100 mg of Demerol and 50 mg of Vistaril and sent home. *Id*.

Dr. Ta's next treatment note for Claimant is April 1, 2003, three months after her date last insured. R. 734. Claimant reported an acute attack of low back pain. R. 734. Dr. Ta also noted that she takes Fiorcet and Maxalt for migraines and that the Maxalt works quite well. *Id*. At the time of the visit, Claimant was not on any medications, but was taking a multivitamin. *Id*. Dr. Ta found an acute onset of low back pain and chronic neck pain due to degenerative disc disease. *Id*. He prescribed 1 mg of Klonopin once a day and gave her a prescription for Fiorcet and Maxalt. *Id.*

On April 17, 2003, Claimant was taking Fiorcet when necessary, 2 mg of Klonopin every

night and 10 mg of Maxalt when necessary. R. 733. Dr. Ta's impression was that Claimant's chronic recurrent migraine headaches were under good control, but she was suffering from chronic neck pain due to degenerative disc disease and acute sciatica. *Id*. He gave Claimant a prescription for 60 tablets of Vicodin. *Id*. The record includes pharmacy records for Claimant beginning in 2001. Those records show prescriptions for Fiorcet. R. 1092-94. They also show that Claimant filled prescriptions for 160 Butalbital tablets between March 12, 2002 and August 7, 2002. R. 1092-93. Butalbital is a headache medication. R. 256. The Butalbital dosing instructions indicate that Claimant was to take 1-2 tablets every 4 hrs, up to 6 per day. *Id*.

**E. The ALJ's Decision - April 26, 2010**

Following the April 6, 2009 and February 1, 2010 hearings and a review of the medical evidence, the ALJ found that Claimant was not disabled under the Social Security Act. R. 164. In making this determination, the ALJ analyzed Claimant's application under the required five-step sequential analysis. R. 154-163. At step one, the ALJ accepted Claimant's self-reports and found that she had not engaged in substantial gainful activity during the relevant time period. R. 154. At step two, the ALJ determined that the medical evidence established that Claimant had at least one medically severe impairment or its equivalent under 20 C.F.R. 404.1520(c). *Id*. However, the ALJ does not clearly identify the one or more medically severe impairments. R. 154-155. The ALJ noted that Claimant had been diagnosed with severe disc degeneration, migraine headaches and fibromyalgia. R. 154. The ALJ also mentioned Claimant's allegations of pain. *Id*. The ALJ further noted that Dr. Leigh, who is board certified in internal medicine and testified as a medical expert at the February 1, 2010 hearing, stated that Claimant had been diagnosed with fibromyalgia and medically severe migraine headaches. R. 155. The ALJ also found that the

medical evidence of record did not establish the presence of a mental disorder cognizable under § 12.07 of the Listing of Impairments. *Id.*

At step three, the ALJ concluded that, even in combination, Claimant's physical and mental impairments did not meet or medically equal the criteria of any listing in the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.* The ALJ explained that, as of her date last insured, the medical evidence did not support the existence of stenosis or neuroforaminal impingement required under § 1.04 A of the Listing of Impairments. *Id.* There are no specific listings for fibromyalgia or migraine headaches, and the ALJ found that Claimant's treating physicians had not adequately documented the frequency or persistence of her headaches, or a maintenance treatment for prevention sufficient to satisfy the requirements of § 11.03 of the Listing of Impairments.

At step four, the ALJ determined that as of the date last insured, Claimant had the RFC to perform a range of light work, and that she could have performed her past relevant work as an administrative assistant as it is generally performed in the national economy. R. 156, 163. The ALJ construed Claimant's RFC as of her date last insured as being "limited to lifting and/or carrying up to 10 pounds at a time frequently; standing and/or walking up to 4 hours in an 8 hour workday; needed to avoid climbing ropes, ladders, or scaffolds, needed to avoid working at unprotected heights, or around hazards; needed to avoid more than moderate exposure to vibration; needed to avoid concentrated exposure to machinery; should have no more than occasionally climbed ramps or stairs; and needed to avoid commercial driving." R. 162. The ALJ found the opinions of the medical experts, Dr. Leigh and Dr. Oberlander, "to be the most informed, consistent with the medical evidence, convincing, and consistent with the record as a

whole." R. 163. Because the ALJ found Claimant capable of performing her past relevant work, he did not make a step five finding and concluded Claimant was not disabled under the Social Security Act and therefore denied her application for disability insurance benefits. R. 163.

## II. LEGAL STANDARD

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Counsel denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id*. Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, the reviewing court must "conduct a critical

review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.      Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(I-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;

(4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id*. Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exists in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

The ALJ noted, and this Court agrees, that timing is a complicating factor in this case. The alleged onset date of Claimant's physical impairments was July 30, 1997, and they became progressively worse over time. The initial hearing before the ALJ was almost twelve years after the alleged onset date and more than six years after Claimant's date last insured. Given this context and a voluminous record, the ALJ's task of determining Claimant's limitations between 1997 and 2002 was not easy. Based upon a thorough review of the record and the ALJ's decision, however, the Court concludes that the ALJ erred by failing to make an express finding regarding Claimant's credibility while effectively discounting Claimant's testimony concerning the severity and debilitating effects of her migraine headaches during the relevant time period. The ALJ also erred by ignoring the medical expert's change in his opinion during the hearing to the effect that Claimant could not engage in sustained gainful activity during the relevant time period based on additional medical evidence and Claimant's testimony at the hearing.

### A.      The ALJ Did Not Build A Logical Bridge To His Implicit Credibility Determination

The record contains medical evidence that Claimant suffered from severe migraine headaches going back to her alleged onset date and before her date last issured. The ALJ implicitly found that the objective medical evidence did not support Claimant's contention about the debilitating effects of those headaches. But he did not make an express finding that

Claimant's testimony was not credible about the effects of her migraine headaches in the course of determining that Claimant was not disabled before her date last insured. This gap in reasoning requires a remand despite the ALJ's attempt to conduct a careful analysis in this difficult case.

Whenever a Claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the credibility of the Claimant's testimony based on the entire case record. SSR 96-7p; *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Because pain affects people differently, allegations of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

The ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). In other words, the Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). The basis for the ALJ's credibility determination, however, must be articulated and "sufficiently specific" to make clear to a claimant and subsequent reviewers the weight given to a claimant's statements and the reasons for the weight given. SSR 96-7p.

The ALJ noted that Claimant credibly reported that her condition had worsened over time. R. 156. He also felt that she made a sincere effort to recall what had occurred during the time period relevant to her disability claim. R. 103. Nevertheless, the ALJ found that Claimant

"had the difficulty of compressing time and events in her testimony" and had problems "identifying the frequency, duration, and intensity of symptoms at any given period of time." R. 157. Because of those problems, the ALJ concluded that he needed to "rely upon contemporaneous patient progress notes of treating sources during the material period at issue to more closely evaluate the nature, frequency, duration, and intensity of her symptoms." *Id.* The ALJ apparently decided to rely on what he believed to be the medical evidence to the exclusion of anything Claimant or her niece reported about her physical condition and headaches during the relevant time period.

Claimant provided medical evidence documenting severe migraine headaches between July 1997 and December 2002. "[O]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Both Claimant and her niece testified as to the debilitating effects of Claimant's migraines during the relevant time period. *See*, *e.g.*, R. 76-79, 115-117. If the ALJ discredited Claimant's testimony concerning the debilitating effect of her headaches and other ailments during the relevant time period, he was required to provide more analysis and support than a summary conclusion that she had "the difficulty of compressing time and events" and "problems identifying the frequency, duration, and intensity of symptoms." R. 157. The ALJ provides no examples from Claimant's testimony to support these statements, and the Court's review of Claimant's testimony, frankly, indicates that these characterizations may not be fully supported in light of the detail that Claimant and her niece were able to provide. R. 58-59, 75, 77-80, 115-117.

In fact, Pagella, the vocational expert, and Dr. Leigh, the medical expert, both testified that based on Claimant's testimony and her stated physical limitations she would not have been able to work as of her date last insured. They apparently found Claimant's testimony together with other evidence in the record sufficient to render those professional opinions. The ALJ never expressly stated that he did not find Claimant's testimony credible. As noted above, he appears to have found Claimant to be a believable witness.[3] However, by finding Claimant capable of performing light work, the ALJ implicitly found that Claimant's testimony regarding her headaches, pain, and physical limitations after her alleged onset date were not credible. Unfortunately, the ALJ did not build an accurate and logical bridge to that conclusion. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Nowhere in his decision does he provide the building blocks necessary for this Court to assess whether the ALJ's decision not to credit Claimant's testimony concerning the severity of her headaches and the effect of those headaches upon her ability to function is supported by substantial evidence. On remand, the ALJ should provide more specific reasons and evidentiary support in the record for his implicit credibility finding. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

**B.     The ALJ Did Not Build A Logical Bridge To His RFC Determination That Claimant Was Capable Of Light Work**

The ALJ also did not adequately support his finding that Claimant was capable of light work. The Seventh Circuit has held that "the ALJ must consider 'all relevant evidence' and may not analyze only that information supporting the ALJ's final conclusion." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)(citing *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)). While

---

[3] "As she credibly reported, her condition had worsened with the passage of time." (R. 156); "There's no question of your sincerity. None." (R. 103).

the ALJ is not required to articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss evidence that contradicts the Commissioner's position. *Id*. In this case, the ALJ adopted the medical expert, Dr. Leigh's, initial RFC opinion without explaining why he did not credit Dr. Leigh's revised opinion, stated on the record during the hearing, that Claimant was not capable of sustained gainful activity five days a week, eight hours a day.

Dr. Leigh, the medical expert, initially opined that Claimant was capable of performing light work. R. 31. After he was reminded that Claimant was taking Zomig, a powerful drug taken to treat severe headaches, and after he listened live to Claimant's testimony, he revised his opinion: "Based on the testimony, your honor, in addition to the medical evidence of record, I would revise my testimony to say that, in my opinion, [Claimant] could not sustain gainful activity eight hours a day, five days a week." R. 96. The Commissioner argues that the medical expert revised his opinion based only on Claimant's testimony. Defendant's Response To Plaintiff's Motion for Summary Judgment [DE#23] at 4. That is not an accurate reading of the record. Dr. Leigh clearly stated that he was revising his opinion based on Claimant's testimony "in addition to the medical evidence of record." R. 96. Claimant is correct that the reference to the "medical evidence of record" may harken back to Dr. Leigh's earlier testimony when he was reminded that Claimant was taking Zomig, something that he had not remembered or focused on when he gave his initial opinion that Claimant was capable of light work. As Dr. Leigh said under questioning by Claimant's attorney, after being shown records that Claimant was taking Zomig and that her treating physician, Dr. Ta, had asked her insurance company to increase the number of pills she was allowed per month to provide more medication for her headaches, "I stand corrected." R. 32.

The ALJ ignores Dr. Leigh's revised opinion and quotes only his initial opinion that Claimant is capable of light work. Claimant is thus correct that the ALJ erred by relying on Dr. Leigh's earlier opinion concerning Claimant's RFC that apparently did not take into account some of the medical evidence – that Claimant was taking enough Zomig during the relevant time period to indicate that she very well may have been having more than one medically severe headache per week despite at least three months of prescribed treatment. The ALJ cannot rely on Dr. Leigh's opinion concerning Claimant's RFC without discussing Dr. Leigh's revised opinion after he was corrected concerning what apparently was important medical evidence in the record and after he listened to Claimant's testimony.

When an ALJ does not address evidence of this nature, remand is necessary to allow him to do so and to allow a reviewing court to determine whether the ALJ's decision rests on substantial evidence. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003). The ALJ in this case acknowledged that he struggled to understand the extent of Claimant's limitations during the relevant time period and before her date last insured, which was roughly between five and ten years before Claimant's hearing, and the Court sympathizes with his predicament. But to understand whether the ALJ's ultimate determination is supported by substantial evidence, the Court needs to know that he considered, and how he dealt with, evidence that supports Claimant's argument that she was disabled during that time and that does not seem to support the ALJ's decision to rely upon the medical expert's initial opinion and uncorrected testimony concerning Claimant's RFC.

**C.     Other Matters To Be Considered On Remand**

On remand, the ALJ also should address other evidence that his decision does not

indicate he took into consideration. For example, Claimant submitted pharmacy records, including records from 2002. The 2002 records show that Claimant filled prescriptions for 160 Butalbital tablets between March 12, 2002 and August 7, 2002. R. 1092-93. Butalbital is a headache medication, and the dosing instructions indicate that Claimant was to take 1-2 tablets every 4 hrs, up to 6 per day. *Id*. If Claimant was taking the tablets as prescribed, her pharmacy records suggest that she suffered from at least 23 headaches in the 21 weeks between March 12, 2002 and August 7, 2002. The ALJ erred in not discussing these prescriptions and explaining why they did not support Claimant's testimony regarding the frequency and persistence of her headache symptoms particularly as relevant to Listing 11.03 and the epilepsy analogy. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

In addition, Claimant's treatment notes from Dr. Ta between 1999 and 2002 indicate a cautious approach to the treatment of her headaches and other ailments because she was undergoing fertility treatments, pregnant, or nursing for the majority of the time between her alleged onset date and date last insured. The ALJ placed significant weight on the lack of prescriptions for maintenance and preventative medications for Claimant's headaches during that time period. However, he failed to mention or consider Dr. Ta's consistent treatment notes indicating that he was delaying further treatment because of Claimant's pregnancies and fertility treatments. On remand, the ALJ should consider whether Dr. Ta's delaying or modifying Claimant's course of treatment in light of her fertility treatments, pregnancies and nursing has any bearing on the ALJ's ultimate analysis and conclusions.

Finally, the ALJ did not specify which of Claimant's impairments were medically severe. Instead, the ALJ listed Claimant's alleged physical impairments of severe disc degeneration,

migraine headaches, and fibromyalgia, and then generally concluded that at least one of those impairments was medically severe. This omission, on its own, is not reversible error. *Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012). Because this case is being remanded on other grounds, however, when the ALJ addresses those other grounds, he should also specify which of Claimant's impairments are medically severe.

## IV. CONCLUSION

For the reasons set forth above, the Court grants Claimant Kim M. Kwitschau's motion for summary judgment [Dkt. #20], and remands the case for further proceedings consistent with this opinion. This is a final and appealable order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 14, 2013